**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**DENISE DAWN DONAHUE,**

      **Plaintiff,**

v.                                                        **CASE NO. 2:11-CV-00644**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

**M E M O R A N D U M   O P I N I O N**

      This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

      Plaintiff, Denise Dawn Donahue (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on June 27, 2008, alleging disability as of May 1, 2007, due to emphysema, right knee pain, and chest pain.  (Tr. at 16, 191-99, 200-02, 234-40, 266-72, 296-300.)  The claims were denied initially and upon reconsideration.  (Tr. at 16, 100-04, 105-09, 112-14, 115-17.)  On January 16, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 118-19.)  The hearing was held on June 23, 2009 before the Honorable Valerie A. Bawolek.  (Tr. at 28-54, 127, 132.)  A supplemental hearing was held on February 23, 2010 before Judge Bawolek.  (Tr. at 55-93, 123, 164.)  By decision dated April 29, 2010, the ALJ determined that Claimant was not entitled to benefits.  (Tr.

at 16-27.)  The ALJ's decision became the final decision of the Commissioner on August 26, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On September 20, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads

2

to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she met the insured status requirements through December 31, 2010 and has not engaged in substantial gainful activity since the alleged onset date, May 1, 2007.  (Tr. at 18.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of degenerative disc disease, degenerative disc disease of the right knee, chronic obstructive pulmonary disease [COPD], depressive disorder, personality disorder, and polysubstance abuse.  (Tr. at 19-20.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 20-21.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 21-25.)  Claimant has no past relevant work.  (Tr. at 26.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as cafeteria attendant, simple cashier, and sales attendant which exist in significant numbers in the national economy.  (Tr. at 26-27.)  On this basis, benefits were denied.  (Tr. at 27.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner

denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was 48 years old at the time of the administrative hearing.  (Tr. at 32.)  She has a GED and at the time of the hearing was enrolled in her final semester to obtain a Medical Coding Degree or Certificate from Garnet Career Center with a 3.8 grade point average [GPA].   (Tr. at 33, 53, 308-09.)   In the past, she worked as a janitor for approximately seven years, and briefly at various times as  a server, caregiver, cashier, and pharmacy warehouse worker.  (Tr. at 236, 239, 246-53.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of

record, and will summarize it below.

<u>Physical Health Evidence</u>

Records indicate David Santrock, M.D., treated Claimant from January 17, 1991 through December 13, 1994 for two right knee injuries, the first occurring on May 22, 1990 when she fell, and the second occurring on September 24, 1992 when she struck her right knee while working in a warehouse.  (Tr. at 324-37.)  On September 9, 1994, he performed a right knee arthroscopy.  (Tr. at 326-27.)  On the final office note dated December 13, 1994, Dr. Santrock stated that "with respect to her knee problem…[I] have exhausted all measures that I am aware of that would be beneficial."  (Tr. at 324.)  An office notation dated January 24, 1995 indicates: "Letter from Comp indicating Dr. Loimil is assuming her care."  <u>Id</u>.

Records indicate Luis Loimil, M.D., treated Claimant from January 19, 1995 to July 17, 1996 for right knee pain.  (Tr. at 339-45.)  On November 9, 1995, Dr. Loimil performed an arthroscopic examination of her right knee.  (Tr. at 341.)  On January 31, 1996, he noted: "She is complaining bitterly of pain…I feel her complaints are totally out of proportion to the clinical findings and I would like to request that she be referred to Dr. Mukkamala for an IME [Independent Medical Examination] vs. PPI [Permanent Partial Impairment] evaluation."  (Tr. at 339.)

Records indicate Claimant was treated at Thomas Memorial Hospital Emergency Room on 12 occasions from April 10, 2001 to November 17, 2008.  (Tr. at 346-82, 822.)  On the first occasion, April 10, 2001, Claimant "presented to the emergency room [ER] seeking help for drug and alcohol problems as well as severe depression.  She admits to using drugs ever since she was a teenager.  Patient states that using $100 to $800 a day of cocaine."  (Tr. at 379.)  The fifth through tenth visits to the ER were for right knee pain, right-sided

low back pain, and headaches.  (Tr. at 362-76.)   On June 24, 2002, Claimant complained of right-sided low back pain due to a fall "four days ago at a grocery store."  (Tr. at 373.) The final four ER visits (May 3, 2004, November 8, 2004, November 28, 2006, December 4, 2006) were also due to alleged falls wherein she injured her left arm and back. (Tr. at 347-62.) An x-ray taken at Thomas Memorial Hospital on November 17, 2008, shows: "The heart is normal in size.  The lungs are clear.  The pleural spaces are clear.  Spondylosis and kyphosis of the thoracic spine is seen.  There is no acute process identified."  (Tr. at 822, 898.)

Records indicate Claimant was treated at St. Francis Hospital on seven occasions: May 13, 2006 for "otitis externa" also known as "swimmer's ear"; November 8, 2006 for sinusitis; March 22, 2007 for a "fall down stairs right knee hurting"; August 1, 2007 for left-sided chest pain; October 14, 2007 for swimmer's ear; and January 19, 2009 for bronchitis. (Tr. at 384, 400, 421, 432, 434, 859-70.)

Records indicate Claimant was treated at Charleston Area Medical Center [CAMC], primarily at the Emergency Department, on 53 occasions from July 4, 1995 to August 20, 2009 (Tr. at 445-803, 823-26, 993-1042):  July 4, 1995 for abdominal pain (Tr. at 800); July 6, 1995 for abdominal pain (Tr. at 802); August 11, 1995 for dysmenorrhea (painful menstruation) (Tr. at 793); November 9, 1995 for right knee arthroscopy (791); February 18, 1997 for jaw pain (Tr. at 788); September 8, 1998 for lower abdominal pain (Tr. at 786); October 22, 1998 for left sided pain (Tr. 785); December 25, 1998 for back pain and right jaw pain (Tr. 780); March 1, 1999 for bilateral salpingo-oophorectomy (removal of ovaries) and appendectomy (Tr. 773-74); May 24, 1999 for ventral hernia (Tr. at 763); May 31, 1999 for hernia surgery (Tr. at 750); June 23, 1999 for hernia surgery drainage (Tr. at

744); July 26, 1999 for abdominal pain (Tr. at 736); August 31, 1999 for repair of incisional hernia (Tr. at 734); January 16, 2000 for unrestrained motor vehicle accident with frontal headache and right jaw and lip pain (Tr. at 718); June 26, 2000 for toothache (Tr. at 705); October 10, 2000 for toothache (Tr. at 703); October 29, 2000 for tooth pain (Tr. at 701); December 9, 2000 for chest pain (Tr. at 688); April 6, 2001 for lower abdominal pain (Tr. at 682); June 19, 2001 for chest discomfort (Tr. at 661); December 8, 2001 for "right lumbar pain which began after a fall yesterday" (Tr. at 653); June 19, 2002 for "fell on a wet floor at the store" (Tr. at 635); July 2, 2002 for "I fell at the supermarket" (Tr. 632); September 16, 2002 for right knee pain (Tr. at 629); November 16, 2002 for right knee pain (Tr. at 626); January 5, 2003 for right knee pain (Tr. at 623); March 22, 2003 for right knee pain (Tr. at 620); August 8, 2003 for bilateral lower quadrant pain (Tr. at 602); August 31, 2003 for withdrawal symptoms from a "long standing history of IV opiate abuse" (Tr. at 595); September 13, 2003 for headache (Tr. at 587); February 4, 2004 for headache with photophobia (Tr. at 582); April 16, 2004 for headache and photophobia (Tr. at 575); April 19, 2004 for back and rib pain following a fall (Tr. at 571);  October 28, 2004 for right back pain following a fall (Tr. at 566); October 25, 2005 for right-sided rib pain (Tr. at 562); February 20, 2006 for  left foot pain due to a fall (Tr. at 446, 551); September 29, 2006 for right ankle pain and cough (Tr. at 450, 537); November 7, 2006 for right jaw pain (Tr. at 462, 534); March 27, 2007 for bilateral knee pain and low back pain due to a fall (Tr. at 465, 529); September 18, 2007 for left ear pain (Tr. at 470, 518); September 25, 2007 for earache (Tr. at 473, 513); October 16, 2007 for earache, sore throat and fever (Tr. at 477, 509); January 31, 2008 for bilateral heel pain (Tr. at 480, 505); July 20, 2008 for right middle finger pain due to a fall (Tr. at 526); June 16, 2008 for low back pain (Tr. at 483, 498);

December 15, 2008 for sore throat (Tr. 824); May 5, 2009 for right buttock and back pain (Tr. at 994); May 16, 2009 for low back and right leg pain (Tr. at 998, 1027); May 31, 2009 for back pain (Tr. at 1004); June 21, 2009 for back pain (Tr. at 1017); July 23, 2009 for back pain (Tr. at 1021); and August 20, 2009 for back pain (Tr. at 1024).

Records from Rite Aid #1582 show Claimant was prescribed the following medications from May 1, 2007 to June 16, 2009: Oxycodone, Hydrocodone, Symbicort, Methylprednisolone, Lorazepam, Doxycycline, Penicillin, and Acetaminophen - Codeine #3. (Tr. at 911-13.)

On August 14, 2008, a State agency medical source completed an internal medicine examination of Claimant. (Tr. at 804-12.) The examiner, Kip Beard, M.D., concluded:

> IMPRESSION:
> 1.    Possible chronic bronchitis with possible asthmatic component.
> 2.    Right knee internal derangement, status post arthroscopic surgery with possible osteoarthritis.
>
> SUMMARY: The claimant is a 47 year old female with a history of increasing breathing trouble over the last 2 ½ years. She states a chest x-ray and an emergency room visit showed evidence of emphysema. She does have significant smoking history. Examination of the lungs today revealed some mildly distant breath sounds. I did not hear wheezes, rales, or rhonchi. There did seem to be a mild degree of dyspnea following exertion. Pulmonary spirometry was interpreted as normal today.

(Tr. at 808.)

On September 12, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment [PRFCA]. (Tr. at 813-20.) The evaluator, Rogelio Lim, M.D., found that Claimant could perform medium work, perform all postural activities frequently save for climbing ladder/rope/scaffolds, which she could do occasionally. (Tr. at 815.) Dr. Lim opined that Claimant had no manipulative, visual, communicative, or

environmental limitations, save to avoid concentrated exposure to "vibration" and "fumes, odors, dusts, gases, poor ventilation, etc." (Tr. at 816-17.)   Dr. Lim commented: "OA [Osteoarthritis] allegations not credible PFT [Pulmonary Function Test] normal right knee pain but x-ray revealed mild arthrosis.   Right knee pain somewhat exaggerated.   RFC [Residual Functional Capacity] made on the basis of medical evidence." (Tr. at 820.)

Records show that Claimant was treated by Kevin Eggleston, M.D. on November 17, 2008 and December 23, 2008 for her breathing difficulty concerns. (Tr. at 887-909.)  Dr. Eggleston's initial notes indicate that Claimant has smoked two packs of cigarettes per day for thirty years. (Tr. at 904.)  He notes that his plan is to refer Claimant "to cardiology for a stress test.  Encourage to quit smoking and give script for nicotine patches.  Give sample of symbiort 80/4.5 for possible asthma." (Tr. at 901.)   On December 8, 2008, Dr. Eggleston states: "Suspect she is having panic attacks.  Start her on lexapro and only take the ativan at night.  Told patient she needs to find a PCP [primary care provider].  Follow up in 4 months." (Tr. at 890.) On May 21, 2009, Dr. Eggleston stated in a form titled "Emphysema Questionnaire" that his diagnosis was "COPD, emphysema, chronic low back pain." (Tr. at 908.)  He opined that Claimant could walk two city blocks without rest, would need unscheduled breaks during an 8 hour working day, and would require  the use of "inhalers" throughout the day. (Tr. at 909.)

On December 3, 2008, a State agency medical source attempted to complete a Physical Residual Functional Capacity Assessment [PRFCA]. (Tr. at 827-34.)   The evaluator, Uma Reddy, M.D. stated: "This claimant alleges worsening of her symptoms, but no recent ADLs are available.  Insufficient evidence to evaluate this claim fully." (Tr. at 832.) "Forms not returned after follow-ups and third party contact, please advise

insufficient evidence." (Tr. at 834.)

Records indicate that Claimant was treated by Scott Duffy, M.D. on December 8, 2008, December 16, 2008, and January 13, 2009 upon referral by Kevin Eggleston, M.D. regarding Claimant's complaints of chest discomfort. (Tr. at 835-57.) On December 16, 2008, Dr. Duffy stated: "Negative treadmill stress test, No arrythmias, Positive chest pain, which resolved during recovery, Decreased functional capacity, Cardiolite [stress test] to follow." (Tr. at 841.) Dr. Duffy concluded in the January 13, 2009 report: "Stress [test] is normal. She is cutting back on smoking, needs to quit. Echo looks OK. Follow up in one year with periodic stress due to family history and tobacco." (Tr. at 838.)

On May 16, 2009, Claimant was treated at Family Medical Center for a "[f]all with back pain, numbness in legs." (Tr. at 990-92.) Stephen M. Elksnis, M.D., radiologist, reviewed x-rays of Claimant's thoracic spine and lumbar spine and concluded:

> A total of 5 images of the thoracic spine are submitted. Vertebral bodies are normal in height. There is no evidence for fracture or paravertebral mass.
>
> IMPRESSION: Normal radiographic examination of the thoracic spine. No evidence for acute bony injury of the thoracic spine.
>
> *       *       *
>
> Vetebral bodies are normal in height. There are small marginal osteophytes at the L3-4 and L4-5 levels due to early degenerative change. There is no evidence for fracture or spondylolisthesis.
>
> IMPRESSION: Early degenerative changes at the L3-4 intervertebral disc and the facet joints at the L5-S1 level. There is no evidence for acute bony injury of the lumbar spine.

(Tr. at 990-91.)

On July 13, 2009, Darshan Dave, M.D., Neurology and Headache Clinic, stated that he was "asked to see this patient in consultation by DR" due to Claimant's "Chief Complaint: back pain...present since last 3 months with gradual worsening...No weakness.

No incontinence...back pain radiating to bilateral lower extremities with parensthesia...based on symptoms and examination imaging studies are required to r/o [rule out] structural abnormalities." (Tr. at 1038-39.) On that same date, Dr. Dave performed an Electromyography/Nerve Conduction Study of Upper and Lower Extremities and reported that it was a "normal test."

Mental Health Evidence

Records indicate Claimant was treated at Prestera Center for Mental Health Services, Addictions's Recovery Center, ["Prestera"] from June 29, 2006 to July 27, 2006 [detox and residential treatment] for dependence on cocaine, opioids, sedatives, and alcohol. (Tr. at 923-89.) The Admission Assessment states: "This client reports that she has pending charges for prostitution, soliciting and simple drug charges with assault on a police officer." (Tr. at 966.) The discharge summary form states:

> Denise appears stable, mood and affect appropriate. Denise denies any SI/HI [suicidal ideation/homicidal ideation] at this time. Denise has successfully completed the Park West program, along with goals and objectives on her MISP...
>
> Denise plans to continue treatment through outpatient services offered at Parc East, and plans to attend AA/NA [Alcoholic Anonymous/Narcotics Anonymous] meetings.

(Tr. at 923.)

On January 29, 2009, Sheila E. Kelly, M.A., licensed psychologist, provided a report of psychological evaluation upon referral by Claimant's representative. (Tr. at 872-86.) Ms. Kelly concluded:

> MENTAL STATUS EXAMINATION:
> This is a tall, thin, white female dressed in jeans and a sweater. She looks at least fifteen years older than her stated age due to a long history of substance abuse including alcohol, crack cocaine, and any other drugs that were

11

available.  She is also very anxious and depressed although there are some histrionics as well.  She is manipulative, very dependent, and passive-aggressive.  She was in tears throughout the interview, using almost an entire box of Kleenex but some of the tears appeared to be designed to attempt to manipulate the examiner.

Sleep is disturbed by self-report.  She describes her appetite as "I go in little spurts, sometimes I just eat and eat and eat".  Weight is stable.

Mood is depressed and anxious.  She has no history of suicide attempts but claims to experience significant suicidal ideation without intent.

Attention, concentration, and short-term memory are poor by self-report...

       \*       \*       \*

<u>RESIDUAL FUNCTIONAL CAPACITY</u>:

<u>*Activities of Daily Living*</u>:

Since July, Mrs. Donahue has been living in subsidized housing for the elderly and disabled.  Prior to that, she had been the past four years living with her younger daughter.  She maintains her own household and is currently participating in a work training program at Garnet Career Center.  She participates in the work training program in order to obtain PELL grant money which she uses to support herself.

Mrs. Donahue has a long history of polysubstance abuse with particular dependence on alcohol and crack cocaine.  She continues to have episodes of substance abuse although they are relatively rare by self-report.

She is facing a number of court charges which have accumulated over the years and involve simple possession, solicitation for prostitution, and a variety of traffic violations.  Over the years, she has simply ignored summonses to appear in court but finally a habeas was issued for her arrest.  She is pending resolution of those charges at the present time.  As a result of the charges, she lost her driver's license some time ago.  She relies on her family for transportation.

<u>*Social Functioning*</u>:

All of Mrs. Donahue's past friendships have been with fellow substance abusers.  She has been through at least two residential substance abuse treatment programs and has gradually seemingly gained some control over her substance abuse but as a result has become rather socially isolated.  She relies heavily on her sister in Tennessee and her three children for emotional,

moral, and financial support.

*Concentration, Persistence, and Pace*:

Mrs. Donahue claims to have significant problems with attention and concentration. She does appear to have difficulties finishing tasks she begins and significant problems with authority. She is not reliable or responsible and her attendance has reached the point in her training program that she is about to be discharged from it, thereby losing her grant money and her source of financial support.

*Deterioration in Work or Work-like Settings*:

Mrs. Donahue has worked off and on over the years. Because she is seemingly intelligent, she has no difficulty finding jobs and obtaining responsible positions but her substance abuse and personality pathology make her very unreliable and at times irresponsible. As a result, she loses her positions. She has been married or had a number of boyfriends, all of whom were substance abusers who eventually ended up in the prison system. She can be expected to have problems with attendance, reliability, judgment, relationships with her peers, and relationships with supervisors.

Mrs. Donahue should have a payee established for her benefit should she be determined to be disabled. Primarily this is due to her history of poor judgment, poor impulse control, and substance abuse.

DIAGNOSTIC IMPRESSION:

| | |
|---|---|
| Axis I | Generalized Anxiety Disorder |
| | Depressive Disorder, Not Otherwise Specified [NOS] |
| | Alcohol Dependence, In Remission by Self-Report |
| | Cocaine Dependence, In Remission by Self-Report |
| | Polysubstance Abuse, In Remission by Self-Report |
| Axis II | Personality Disorder, NOS, with Histrionic, Dependent, Passive-Aggressive, Borderline Features |
| Axis III | Knee Pain (I have no medical records at the time of this evaluation) |

(Tr. at 877-80.)

On January 29, 2009, Ms. Kelly completed a "check-mark" form regarding Claimant's psychological limitations. (Tr. at 884-86.) She marked "Not Limited" in the ability to: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary

routine without special supervision; ability to ask simple questions or request assistance; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation. (Tr. at 884-85.) She marked "Slightly Limited" in the ability to understand and remember detailed instructions and to carry out detailed instructions. Id. She marked "Moderately Limited" in the ability to maintain attention for extended periods; work in coordination or proximity to others without being unduly distracted by them; make simple work-related decision; complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; get along with co-workers or peers without unduly distracting them or exhibit behavioral extremes, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently of others. (Tr. at 884-86.) She marked that Claimant was "Markedly Limited" in the ability to maintain regular attendance and be punctual within customary tolerances; accept instructions and respond appropriately to criticism from supervisors. Id. Ms. Kelly responded "Not clear [due to] [s]ignificant personality pathology" to the question: "If this individual has a substance abuse problem, would he/she still be disabled apart from her substance abuse. (Tr. at 886.)

On July 22, 2009, Kelly Robinson, M.A., Licensed Psychologist, provided a psychological evaluation of Claimant. (Tr. at 914-19.) Ms. Robinson stated that Claimant "receives no treatment" and "reports no mental health treatment" history. (Tr. at 914-15.) The results of Claimant's Mental Status Examination [MSE] were:

<u>Orientation</u> - She was alert throughout the evaluation.  She was oriented to person, place, time and date.
<u>Mood</u> - Observed mood was anxious.
<u>Affect</u> - Affect was broad and reactive.
<u>Thought Processes</u> - Thought processes appeared logical and coherent.
<u>Thought Content</u> - There was no indication of delusions, obsessive thoughts or compulsive behaviors.
<u>Perceptual</u> - She reports no unusual perceptual experiences.
<u>Insight</u> - Insight was fair.
<u>Judgment</u> - Within normal limits based on her response to the finding the letter question.  She stated "pick it up and put it in a mailbox."
<u>Suicidal/Homicidal Ideation</u> - She denies suicidal and homicidal ideation.
<u>Immediate Memory</u> - Immediate memory was within normal limits.  She immediately recalled 4 of 4 items.
<u>Recent Memory</u> - Recent memory was within normal limits.  She recalled 3 of 4 items after 30 minutes.
<u>Remote Memory</u> - Remote memory was within normal limits based on ability to provide background information.
<u>Concentration</u> - Concentration was within normal limits based on her score of nine on the Digit Span subtest of the WAIS-III.
<u>Psychomotor Behavior</u> - Characterized by psychomotor agitation.

\*     \*     \*

**DIAGNOSTIC IMPRESSION**

| AXIS I | 296.32 | Major Depressive Disorder, Recurrent, Moderate |
| | 300.02 | Generalized Anxiety Disorder |
| | 304.80 | Polysubstance Dependence, In Remission - Per Client Report |
| | 303.90 | Alcohol Dependence, In Remission - Per Client |
| AXIS II | V71.09 | No Diagnosis |
| AXIS III | By self-report: COPD and back and right knee problems | |

\*     \*     \*

**DAILY ACTIVITIES**

**Typical Day**: Ms. Donahue goes to bed at no specific time and gets up at 10:30 am.  She describes her typical day as "getting up, watch a little bit of tv, I read, lately, I'll read some of my book, take a bath, eat something, I don't do anything and when I do something, I get really depressed cause I am breathing heavier, I would just like to be able to do something.

**Activities**:

**Daily** - makes the bed, watches tv, takes her medications, eats, takes a bath,

reads in her novel, talks to her children and sister on the phone and goes to bed

**Weekly** - visits with her children and grandchildren and goes to the grocery store with her daughter or a friend.  She states "I just go straight to what I got to get and get out, I don't like to shop around."

**Monthly** - could report no monthly activities

**Hobbies/Interests**: None.

### SOCIAL FUNCTIONING

During the evaluation, social functioning was mildly deficient based on her interaction with the examiner and the staff.

### CONCENTRATION

Attention/concentration were within normal limits based on her score of nine on the Digit Span subtest of the WAIS-III.

### PERSISTENCE

Persistence was within normal limits based on the MSE.

### PACE

Pace was mildly deficient based on the MSE.

### CAPABILITY TO MANAGE BENEFITS
Ms. Donahue appears capable to manage any benefits she might receive.

(Tr. at 916-19.)

On July 22, 2009, Ms. Robinson also completed a check-mark form titled "Medical Source Statement of Ability to do Work-Related Activities (Mental).  (Tr. at 920-22.)  Ms. Robinson opined that Claimant's restriction was "mild" regarding her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on complex work-related decisions.  (Tr. at 920.)  She opined that Claimant's restriction was "moderate" regarding her ability to make judgments on complex work-related decisions and

16

interact appropriately with co-workers.  (Tr. at 920-21.)  She checked that Claimant's restriction was "marked" regarding her ability to carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public and supervisors, and to respond appropriately to usual work situations and to changes in a routine work setting.  Id. Ms. Robinson stated that Claimant's diagnosis of Major Depressive Disorder and Generalized Anxiety Disorder were the factors that supported her assessment.  Id.  She responded "No" to the question: "Are any other capabilities affected by the impairment?"  (Tr. at 921.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ did not consider limitations imposed by Claimant's severe mental impairments; (2) the ALJ did not properly analyze the materiality of Claimant's substance abuse and her credibility; (3) the ALJ did not properly weigh the opinion of psychologist Sheila Kelly, an examining mental health expert; (4) the ALJ did not apply the two-pronged treating physician formula to Dr. Eggleston's opinion; (5) the ALJ did not weigh the testimony of the medical expert William Phelps; and (6) the ALJ improperly rejected Generalized Anxiety Disorder as a severe impairment because Claimant had no documented panic attacks.  (Pl.'s Br. at 10-23.)

The Commissioner's Response

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant was not disabled under the Social Security Act because (1) the ALJ did not err in her consideration of Claimant's substance abuse history and her intellectual functioning in evaluating her mental condition; (2) the ALJ took into account Claimant's

mental impairments when determining her residual functional capacity [RFC] and her credibility; (3) the ALJ properly weighed the opinion of Ms. Kelly; (4) the ALJ properly considered the opinion of Mr. Phelps; (5) the ALJ properly considered the opinions of Dr. Eggleston; and (6) the ALJ properly considered Claimant's anxiety in evaluating her RFC. (Def.'s Br. at 16-26.)

Analysis

Mental Health Status

Claimant first argues that the ALJ "failed to account for all of Donahue's mental limitations in the hypothetical proposed to the vocational expert."   (Pl.'s Br. at 10.) Claimant asserts:

> The limitations offered by the ALJ in her hypothetical, which precluded detailed or complex work, target Donahue's intellectual capacity, not the limitations imposed by her depressive disorder and personality disorder...
>
> In this instance, the hypothetical adopted by the ALJ fails to take into account Donahue's deficiencies in social functioning...
>
> Moreover, there exists a disconnect between the ALJ's finding that Donahue suffers from a personality disorder and depressive disorder and the limitations imposed in the hypothetical that Donahue cannot perform detailed or complex work...

(Pl.'s Br. at 11-12.)

> The Commission responds that
>
> Plaintiff raises a series of spurious claims regarding the ALJ's mental evaluation (Pl.'s Br. at 10-19, 21-23)...
>
> For example, Plaintiff argues that the ALJ's restriction addressed her intellectual capacity and did not take into account her moderate limitation in concentration, persistence, or pace (Pl.'s Br. at 10-12).  Plaintiff cites to no evidence that supports her claim (Pl.'s Br. at 11)...
>
> Though Plaintiff argues, further, that she had a restriction in social

18

functioning (Pl.'s Br. at 12, 16-17), by her own admission, she had no problems getting along with authority figures, family, friends, neighbors, and others (Tr. 259-60, 277-78).  Plaintiff submitted no non-medical evidence that documented any work-impeding impairment in social functioning, such as a history of altercations and when she had the funds, she attended medical coding training and participated in an internship program doing clerical tasks (Tr. 872-74, 876, 879).  The ALJ did not err in giving, in part, weight to the information that Plaintiff provided.

(Def.'s Br. at 16-17.)

Claimant argues in a response brief that "if the effects of her substance abuse on her ability to function can not be separated from the effects of her mental impairments, a fully favorable decision is warranted."  (Def.'s Response Br. at 3.)  "In light of the above, the ALJ's RFC and hypothetical to the VE was fatally defective."  (Def.'s Response Br. at 5.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).  Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. §§ 404.1545(a) and 416.945(a) (2010). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989).  "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity."  Id. at 51.  Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe.  Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

The ALJ found Claimant to have the following severe impairments: degenerative disc disease, degenerative joint disease of the right knee, chronic obstructive pulmonary disease (COPD), depressive disorder, personality disorder, and polysubstance abuse.  (Tr. at 19.) Regarding residual functional capacity [RFC], the ALJ concluded

After consideration of the entire record, the undersigned finds that the claimant has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or scaffolds; she can only occasionally climb ramps or stairs; she can occasionally perform balancing, stooping, crouching, kneeling, or crawling; she must avoid pulmonary irritants, temperature extremes, and hazards such as moving machinery; and she cannot perform detailed or complex work.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

(Tr. at 21.)

With regard to mental impairments, the record first indicates that in January 2009 psychologist Sheila Emerson Kelly, M.A., diagnosed the claimant with depressive disorder NOS and personality disorder NOS with histrionic, dependent, passive-aggressive, and borderline features (Exhibit 14F). These diagnoses were partly attributed to the claimant's valid test results...MMPI-2...MCMI-III. Additionally, psychologist Kelly noted the claimant exhibited depressed and anxious mood while attention, concentration, and short-term memory were poor by the claimant's report. The findings regarding depressive symptoms are consistent with the more recent evaluation by consultative examiner Kelly Robinson, M.A., who similarly diagnosed the claimant with moderate recurrent major depressive disorder (Exhibit 18F). Ms. Robinson noted the claimant's report of depressed mood, difficulty concentrating, varied appetite, sleep difficulty, diminished interest in activities, crying spells, and feelings of worthlessness.

On the other hand, Ms. Kelly noted that some of the claimant's copious tears during the interview appeared designed to attempt to manipulation of the examiner (Exhibit 14F). Meanwhile, Ms. Robinson reported the claimant's psychological test results were invalid, possibly indicating lack of cooperation or exaggeration of symptoms (Exhibit 18F). Additionally, psychologist Robinson noted the claimant exhibited several normal findings, including normal orientation; broad and reactive affect; logical and coherent thought processes; absence of delusions, obsessive thoughts, or compulsive behaviors; normal judgment; normal immediate, recent, and remote memory; and normal concentration.

In fact, the claimant's most significant psychological impairment appears to be her long history of polysubstance abuse. In this regard, the record shows

the claimant presented to the emergency room in April 2001 requesting help with her addictions (Exhibit 3F). At that time, the claimant admitted using alcohol, marijuana, and other substances, including $100 - $800 per day of crack cocaine. Accordingly, the claimant was diagnosed with polysubstance dependence.

Thereafter, the evidence suggests the claimant continued to abuse substances over the years. Despite requesting substance abuse assistance as described above in 2001, the claimant reported to psychologist Robinson as well as in her testimony that she again entered a drug rehabilitation program in 2003 or 2004 (Exhibit 18F). The claimant then completed another detoxification program in July 2006 (Exhibit 19F). At the time, she was diagnosed with cocaine dependence, opiate dependence, sedative dependence, and alcohol dependence. She completed the 28-day program but in September 2006 she was again diagnosed with cocaine use (Exhibit 5F). In fact, the claimant informed psychologist Kelly that she last used crack cocaine only a month before her evaluation in January 2009 (Exhibit 14F). Accordingly, there is no clear evidence the claimant has truly stopped her substance abuse, which only serves to further harm her credibility.

Providing an opinion as to the claimant's mental functioning, Marshall D. Tessnear, Ph.D., testified the claimant's primary mental impairment was her polysubstance dependence. Dr. Tessnear then pointed to the fact the claimant was still using cocaine as recently as December 2008. Ultimately, Dr. Tessnear concluded the claimant had only mild to moderate limitations in activities of daily living and social functioning while she had moderate limitations in concentration, persistence, and pace. Dr. Tessnear identified only one episode of decompensation. He further opined that other opinions of record indicating more significant limitations appeared to include restrictions arising from the claimant's substance abuse. Dr. Tessnear's opinion is consistent with the record and is given significant weight.

On the other hand, psychologist Kelly provided an opinion identifying two areas of marked mental limitations and several areas of moderate limitations (Exhibit 14F). She opined the claimant was markedly limited in areas relating to maintaining attendance and accepting instructions and criticism from supervisors. Psychologist Robinson opined the claimant would have marked limitations in handling complex instructions, interacting with the public and supervisors, as well as responding to changes in routine work setting (Exhibit 18F). Although some of these limitations were adopted in the above residual functional capacity, these opinions are given little weight overall as they are inconsistent with the record of conservative care and non-acute objective findings. Moreover, Dr. Tessnear reliably testified that some of these identified limitations were due to the claimant's substance abuse.

In summary, the claimant's subjective complaints and alleged limitations are not fully persuasive and the record as a whole establishes that she retains the capacity to perform work activities with the limitations set forth above.

(Tr. at 24-25.)

The ALJ's hypothetical to the Vocational Expert, Celia Thomas, at the February 23, 2010 hearing:

> Q:   Ms. Thomas, I want you to assume a person the same age, education, and work history as Ms. Donahue, and assume this person is limited to light work. And assume that the person cannot climb ladders, ropes or scaffold. That the person can only occasionally climb stairs and ramps, balance, stoop, crouch, kneel and crawl. This person must avoid pulmonary irritants and temperature extremes, and must avoid hazards and machinery. Ma'am, with this scenario would there be appropriate work for the person I've just described to you?
>
> A:   Yes, your Honor...
>
> Q:   Well, and let me add this. The person can't do detailed or complex work, all right...
>
> A:   ...There would be jobs in both scenarios, Your Honor...

(Tr. at 84-85.)

The undersigned finds that the hypothetical question posed by the ALJ included those limitations that were supported by substantial evidence of record. The ALJ's residual functional capacity finding related to Claimant's impairments reflected Claimant's limitations as supported by substantial evidence of record. These limitations were included in a hypothetical question, and the vocational expert concluded that Claimant could perform work. Claimant's representative had an opportunity to pose additional hypothetical questions to the vocational expert, and did so. The record clearly shows that the ALJ was present and participating in the re-examination of the vocational expert. (Tr. at 84-92.)

Claimant also argues that the ALJ improperly rejected "Generalized Anxiety Disorder [GAD] as a severe impairment simply because there exists no documented panic attacks...In doing so, the ALJ ignores two examining psychologists, both of which diagnosed Donahue with GAD, and two medical expert reviewing sources who confirmed the diagnosis at the hearings  (Tr. 49, 82, 880, 918)."  (Pl.'s Br. at 22-23.)

> The Commissioner responds that
>
> Plaintiff obfuscates the ALJ's decision.  The ALJ did not dispute that Plaintiff's GAD was a medically determinable impairment (Tr. 19).  The ALJ noted, for example, that Ms. Kelly and Ms. Robinson had diagnosed her with a GAD (Tr. 19).  The issue before the ALJ was whether Plaintiff's GAD caused limitations that significantly restricted her ability to perform basic work activities...the ALJ noted that Plaintiff had stopped taking anti-anxiety medication, Ativan, by June 2009 (Tr. 19, 315).  The ALJ noted that Plaintiff's treating sources had never diagnosed her with a GAD, persuasively suggesting that they did not believe that her condition was an on-going medical problem (Tr. 19)...Penultimately, the ALJ noted that she considered all of Plaintiff's impairments when she assessed Plaintiff's RFC and this included her GAD (Tr. 18-19).  Thus, the ALJ considered Plaintiff's anxiety disorder in evaluating her RFC.

(Def.'s Br. at 23-24.)

Claimant responds: "Objective evidence of the affect [sic] of her GAD was spread throughout the record...the Defendant's claim that there was no evidence that her anxiety contributed to her limitations (Def.'s Br. at 23) is erroneous.  Finally, the fact that she stopped taking her medication should not be used against her unless the ALJ explores the reasons for this stoppage.  (See SSR 96-7p)  Here, the ALJ failed to make such an inquiry."

(Pl.'s Response Br. at 6.)

> The ALJ made these findings regarding Claimant's GAD:
>
> [T]he record reflects the claimant was diagnosed with generalized anxiety disorder, also nonsevere.  In this regard, two consultative examiners of record made this diagnosis but no treating source specifically made this

determination (Exhibits 14F, 18F). Further, the record contains no report the
claimant actually had any panic attacks. Although the claimant once was
taking Ativan, the evidence shows the claimant was no longer taking any
medication for anxiety as of June 2009 (Exhibit 20E). Overall, the evidence
fails to show the claimant's anxiety was a severe impairment.

(Tr. at 19.)

The undersigned finds that the ALJ fully considered the evidence of record regarding

Claimant's anxiety disorder and did not err in concluding that based upon several factors

outlined by the ALJ, it was not a severe impairment.

<u>Weighing of Psychological Opinions</u>

Claimant argues that the ALJ did not properly weigh or consider the opinions of the

psychologists, Ms. Kelly, Ms. Robinson, Dr. Tessnear, and Mr. Phelps. (Pl.'s Br. at 14-17.)

Specifically, Claimant asserts: "In rejecting Kelly's report and RFC assessment, the ALJ

does not factor in her evaluation the examining relationship, nor does she consider Support

ability. Moreover, the ALJ ignores the objective signs and test results in Kelly's report and

also ignores her supporting explanations. Finally, the ALJ ignores specialization...she also

fails to properly consider Dr. Tessnear's findings in determining Donahue's RFC! (Tr. 45)"

(Pl.'s Br. at 15-16.)

Claimant argues that the ALJ failed "to mention or weigh the testimony of medical

expert William Phelps, who testified at the second hearing...Phelps corroborated the

findings of GAD and depressive disorder resulting from the testing performed by Sheila

Kelly and later confirmed by Kelly Robinson." (Pl.'s Br. at 21-22.)

The Commissioner responds that

Plaintiff did not have a treatment relationship with any of these psychologists
(Tr. 43-52, 70-84, 872-86). A case cannot be decided in reliance on a medical
opinion without some reasonable support for the opinion...The ALJ adopted

some of the limitations included in these opinions but gave limited weight to those portions that were inconsistent with Plaintiff's non-acute objective findings and record of conservative care (Tr. 25)...

Given that the ALJ decided to, nevertheless, give Plaintiff the benefit of the doubt by finding that she had severe mental impairments outside of her polysubstance abuse (Tr. 19), the ALJ did not commit a reversible error.

(Def.'s Br. at 20-22.)

Claimant responds that "a personality disorder is basically untreatable...The fact that some of her copious tears might have been designed to manipulate is entirely consistent with the diagnosis of her personality pathology." (Pl.'s Response Br. at 7-8.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the

factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The undersigned finds that the ALJ properly considered the opinion evidence of Ms. Kelly, Ms. Robinson, Dr. Tessnear, and Mr. Phelps.  As shown on pages 26-28 of this opinion, the ALJ fully addressed the reports of Ms. Kelly, Ms. Robinson, and Dr. Tessnear. (Tr. at 24-25.) As for the testimony of Mr. Phelps, clearly the ALJ considered his testimony as he questioned him extensively in the February 23, 2010 hearing.  (Tr. at 70-83.) Mr. Phelps concluded that Claimant did not have a severe impairment without substance abuse. (Tr. at 76.) The undersigned notes that despite this testimony, the ALJ gave Claimant the benefit of the doubt by finding that she had severe mental impairments outside of her polysubstance abuse.  (Tr. at 19.)  It is further noted that Claimant did not have a treatment relationship with any of these psychologists.

<u>Treating Physician</u>

Claimant argues that the ALJ "did not apply the two pronged treating physician formula" to the opinions of Kevin Eggleston, M.D., pulmonologist, who opined that Claimant "is able to walk only two city blocks without rest and needs unscheduled breaks during an eight hour day. (Tr. 909)" (Pl.'s Br. at 19.)  Claimant stated: "With respect to Dr. Eggleston's assessment, the ALJ cannot simply disregard a treating physician's RFC without explanation or proper weighing of the evidence.  Dr. Eggleston cited the objective evidence and laboratory findings he relied upon in reaching his RFC."  (Pl.'s Br. at 21.)

The Commissioner responds that

The ALJ determined that Plaintiff's COPD and other impairments restricted her, in part, to non-strenuous work...that did not involve exposure to pulmonary irritants and temperature extremes (Tr. 21)...The ALJ explained why she found Dr. Eggleston's opinion was entitled to "little" weight, contrary to what Plaintiff argues...because it was inconsistent with the record, including Dr. Eggleston's own medical findings, that contained non-acute findings and documented merely conservative care (Tr. 24).

(Def.'s Br. at 24-25.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2010). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking

into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).  These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. §§ 404.1527(d)(2), 416.927(d)(2).

Regarding Dr. Eggleston's reports and opinions, the ALJ made these findings:

[T]he record shows the claimant saw pulmonologist Kevin Eggleston, M.D., who noted in November 2008 the claimant had an abnormal pulmonary function test indicating small airway disease (Exhibit 5F). Dr. Eggleston even noted on examination of the claimant that she exhibited diminished breath sounds and faint wheezing.  Ultimately, Dr. Eggleston determined the claimant had chronic obstructive pulmonary disease (Exhibit 16F). Dr. Beard similarly concluded the claimant had possible chronic bronchitis with possible asthmatic component (Exhibit 7F).

Nevertheless, Dr. Eggleston reported the claimant exhibited no rales, rhonchi, retractions, or labored breathing (Exhibit 15F). He also noted the claimant's spirometry test resulted in an FEV1 that was 83% of the predicted value.  Dr. Beard reported the claimant did appear to have mild dyspnea on exertion but concluded the claimant's spirometry on that occasion was normal (Exhibit 7F). Consistent with these findings, the claimant had a chest x-ray in November 2008 that was normal (Exhibit 9F). Additionally, the record shows only conservative care with a Symbicort inhaler to treat the claimant's breathing difficulties. Notably, the claimant was also able to exert herself for nearly three minutes in a cardiac treadmill stress test, stopping primarily due to fatigue and generalized deconditioning (Exhibit 12F). This demonstrated ability to complete the significant demands of a cardiac stress test combined with the largely benign objective findings and conservative care all indicate the claimant was not as limited by breathing problems as she alleged.

Providing an opinion regarding the claimant's physical limitations, Judith Brendemuehl testified the claimant's COPD was described as "mild" in the record…Overall, Dr. Brendemuehl concluded the claimant could perform light work with the postural and environmental limitations adopted in the above RFC. This opinion is consistent with the record and is given significant weight…

29

Providing another opinion, pulmonologist Dr. Eggleston concluded the claimant was limited to walking no more than two blocks without resting and would need unscheduled breaks during an 8-hour workday (Exhibit 16F). Dr. Eggleston reported these limitations were related to the claimant's COPD and chronic low back pain. However, Dr. Eggleston acknowledged the claimant had a pulmonary function test result with an FEV1 that was 83% of the predicted value. Overall, Dr. Eggleston's opinion is inconsistent with the record of non-acute findings and conservative care. This opinion is thereby given little weight.

(Tr. at 23-24.)

The undersigned finds that the ALJ provided "good reasons" as required by the regulations in concluding that Dr. Eggleston's opinion was entitled to little weight. The ALJ found that Dr. Eggleston's conclusions were inconsistent with the record, including his own medical findings, of "non-acute findings and conservative care." (Tr. at 24.) It is also noted that Dr. Eggleston was not a treating physician of long-standing, rather the record shows that he treated her twice, on November 17, 2008 and December 23, 2008 for her breathing difficulty concerns. (Tr. at 887-909.) Also, Dr. Eggleston's initial notes indicate that Claimant has smoked two packs of cigarettes per day for thirty years. (Tr. at 904.)

Substance Abuse

Claimant next argues that the ALJ did not properly analyze Claimant's substance abuse:

[A]ccording to the ALJ, some of Donahue's limitations were due to her substance abuse, thereby precluding a finding of disabled based upon her mental limitations.

The ALJ, however misunderstands the issue. The issue is not whether the claimant is a substance abuser of long standing, the issue is whether the adjudicator can separate her mental or other impairments from her substance abuse and conclude that, without the latter, the claimant would no longer be disabled...

If it is impossible to separate the vocational impact of her mental impairment

from the vocational impact of her substance abuse, then substance abuse is not material.

In this instance, the ALJ failed to conduct any analysis as to materiality, and this error is critical to the outcome of this case.

(Pl.'s Br. at 13-14.)

The Commissioner responds that Claimant's argument

mis-characterized the role "materiality" plays in drug abuse and alcohol evaluation. An adjudicator determines whether a claimant's drug addiction or alcoholism is a contributing factor material to the determination of disability if the adjudicator finds that the claimant is disabled and there is medical evidence of drug addition or alcoholism (unless eligibility can be based on age or blindness). 20 C.F.R. §§ 404.1535(a), 416.935(a). It is only after the adjudicator determines that the claimant is disabled that the issue arises whether the drug addition or alcoholism is a contributing factor that is material to the determination of disability, i.e., whether the claimant would still be found disabled if she stopped using drugs or alcohol. Id. at 20 C.F.R. §§ 404.1535(b), 416.935(b). Here, the ALJ never found that Plaintiff was disabled due to her polysubstance abuse, therefore, it was unnecessary to determine whether it was material to the determination of her disability (Tr. 13-27). See id. Thus, Plaintiff is wrong.

(Def.'s Br. at 22-23.)

Claimant provided a response wherein she states: "The Defendant appears to have

misconstrued Donahue's argument...It is clear from his [Dr. Tessnear] testimony that

Donahue's substance abuse combined with her other mental impairments, was totally

disabling...Dr. Tessnear's opinion is corroborated by the testimony of Dr. Phelps, who also

identified Donahue's substance abuse as her most significant problem. (Tr. 45-46, 73)."

(Pl.'s Response Br. at 1-2.)

The undersigned finds that the Commissioner has correctly cited to 20 C.F.R. §§

404.1535(a), 416.935(a)(2010). It is only after the ALJ determines that a claimant is

disabled that the issue arises whether the drug addition or alcoholism is a contributing

factor that is material to the determination of disability.  Id. at 20 C.F.R. §§ 404.1535(b),

416.935(b)(2010).  In the subject claim, the ALJ did not find that Claimant was disabled;

therefore, it was not necessary to determine whether her polysubstance abuse was material

to the determination of her disability. (Tr. 13-27.) The undersigned finds that although Dr.

Tessnear and Dr. Phelps testified that Claimant's primary diagnosis was polysubstance

abuse, this does not translate to a finding of disability.  (Tr. 45-46, 73.)  The ultimate

decision about disability rests with the Commissioner.  20 C.F.R. §§ 416.927(e)(1) and

404.1527(e)(1) (2010).

Credibility

     Claimant argues that the "ALJ's analysis of credibility in this case is deficient."  (Pl.'s

Br. at 17-19.)  Specifically, Claimant asserts that "the ALJ improperly discredits Donahue's

credibility due to her history of drug addiction and the weak objective findings and

conservative care of her treating physicians...In failing to make specific findings as to

credibility with clear and convincing reasons for each finding, the ALJ commits reversible

error."  Id.

     The Commissioner responds that Claimant is wrong in asserting that the ALJ's

credibility analysis is deficient:

> The ALJ determined that Plaintiff's statements concerning the intensity,
> persistence, and limiting effects of her symptoms were not credible to the
> extent that they were inconsistent with her RFC (Tr. 22).  The record sustains
> the ALJ's determination.  The ALJ considered what the non-medical and
> medical evidence said (Tr. 18-25).  In basic terms, the credibility of Plaintiff's
> statements about her symptoms and their functional effects is the degree
> which these statements can be believed and accepted as true...
>
> Here the ALJ noted that there was some indicia that Plaintiff may have
> exaggerated her symptoms and non-acute findings and the conservative
> treatment that she received for her non-polysubstance abuse related

> complaints revealed that her claims could not wholly be accepted as true (Tr. 18-25)...
>
> [T]he ALJ noted there was no clear evidence that Plaintiff had "truly" stopped her substance abuse, which the ALJ concluded undermined her credibility (Tr. 25, 31, 50). This was because, in part, Dr. Brendemuehl thought that some of Plaintiff's complaints were, to a degree, related to her seeking opiates (Tr. 41-42).

(Def.'s Br. at 18.)

Claimant responds that "the fact that the Defendant did not contest the Plaintiff's assertion that the ALJ failed to properly assess Donahue's credibility is an admission that he couldn't...The ALJ also attacks her credibility because there was no evidence that she stopped her substance abuse. However, Donahue readily acknowledged that since she had completed rehab, "there had been a few slips." (Tr. 28). She was also otherwise totally up front about her history of substance abuse. (Tr. 36-38). Thus, the ALJ found her not credible for being honest." (Pl.'s Response Br. at 6-7.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

-   The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or

examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining

  physicians or psychologists and other persons about the individual's medical

history, treatment and response, prior work record and efforts to work, daily

activities, and other information concerning the individual's symptoms and how

the symptoms affect the individual's ability to work.

Regarding Claimant's credibility, the ALJ made these findings:

In activities of daily living, the claimant has mild to moderate restriction.  In
this regard, the claimant reported in November 2008 she has essentially no
difficulties caring for herself (Exhibit 10E).  She also denied she required any
special reminders to take care of her personal needs or to take her
medications.  The claimant further reported preparing her own meals daily
as well as doing laundry and minimal household chores.

In social functioning, the claimant has mild to moderate difficulties.  With
regard to this area of functioning, the claimant reported going outside daily
as well as walking and using public transportation (Exhibit 10E).  She
acknowledged being able to go out alone, shop in stores, and spend time with
family.  The claimant further testified she had begun attending church
services.

With regard to concentration, persistence or pace, the claimant has moderate
difficulties.  In this regard, the claimant reported being capable of paying
bills, counting change, handling a savings account, and using a
checkbook/money orders (Exhibit 10E).  She also reported spending time
reading and watching movies.  The claimant was also attending some classes.

As for episodes of decompensation, the claimant has experienced one episode
of decompensation of extended duration.  In this regard, the record shows the
claimant was in Prestera Center for substance abuse detoxification from June
30, 2006 through July 27, 2006 (Exhibit 19F).  Although the claimant
reported additional hospitalizations for substance abuse to psychologist Kelly
Robinson, M.A., no records of these admissions were submitted (Exhibit
18F).

(Tr. at 20-21.)

After consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Essentially, the evidence of non-acute findings and conservative care fails to support the extreme limitations alleged by the claimant. First, in terms of the claimant's alleged back pain, the record shows the claimant had a long-standing history of these complaints. As early as June 2002, the claimant was diagnosed with acute back pain after a reported fall (Exhibit 3F). By May 2009, Kevin Eggleston, M.D., determined the claimant had chronic low back pain (Exhibit 16F). Thereafter, the record reflects multiple emergency room visits indicating the claimant had exacerbations of chronic back pain (Exhibit 21F). Eventually, in July 2009, the claimant saw neurologist Darshan Dave, M.D., who did report the claimant exhibited a positive straight leg raising test on one occasion (Exhibit 23F).

Nevertheless, the objective medical evidence pertaining to the claimant's back condition consists of overwhelming benign findings. For example, a June 2008 x-ray of the claimant's lumbar spine was normal except some "minimal" degenerative changes (Exhibit 5F). Similarly, a May 2009 x-ray of the claimant's lumbar spine revealed only small marginal osteophytes and "early degenerative changes" at L3-4 and L5-S1 (Exhibit 20F). A contemporaneous x-ray of the claimant's thoracic spine revealed absolutely no abnormalities. Consistent with these findings, consultative examiner Kip Beard, M.D., noted in August 2008 the claimant exhibited no spinal tenderness or range of motion abnormalities (Exhibit 7F). Dr. Beard also noted the claimant could stand on one leg, tandem walk, heel walk, toe walk, and squat three-quarters of the way. All of these normal findings combined with the lack of significant or aggressive treatment for back pain suggest the claimant is not as limited by pain as she alleged.

With regard to her knee pain, the record shows the claimant frequently reported right knee pain and "locking up" to her physicians (Exhibits 1F, 2F, 3F, 5F, 6F)...Confirming some abnormalities of the knee, consultative examiner Dr. Beard determined the claimant had internal derangement of her right knee, status post arthroscopic surgery with possible osteoarthritis (Exhibit 7F)...

However, Dr. Beard found no obvious atrophy or weakness of the claimant's right knee (Exhibit 7F)...Notably, the claimant's most recent report of

35

prescribed medications indicates that as of June 2009 she was taking only a non-narcotic anti-inflammatory medication once a day for pain (Exhibit 20E). Again, this record is only minimal conservative care and largely benign objective findings suggest the claimant is not fully credible.

(Tr. at 22-23.)

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain, the court finds that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2010); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause her alleged symptoms. (Tr. at 22.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 20-20.) The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to work, and her broad range of self-reported daily activities. (Tr. at 22-25.) Contrary to Claimant's assertions, there is no evidence that the ALJ "improperly discredits Donahue's credibility due to her history of drug addiction." (Pl.'s Br. at 17.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment

36

Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: September 19, 2012

Mary E. Stanley
United States Magistrate Judge

37